## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Ronald R. Rosen and June I. Trnka,

               Plaintiffs,

     v.

Detective Brian Wentworth, Sergeant Bill
Schmidt, and Officer Roxanne Affeldt, in their
individual and official capacities as police
officers for the City of Champlin, and Officer
Robert Topp, in his individual and official
capacity as a police officer for the
City of Plymouth,

               Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-1188 ADM/FLN

_____

Andrew M. Irlbeck, Esq., St. Paul, MN, and Paul Applebaum, Esq., Applebaum Law Firm, St.
Paul, MN, on behalf of Plaintiffs.

Jason M. Hiveley, Esq., and Amanda L. Stubson, Esq., Iverson Reuvers Condon, Bloomington,
MN, on behalf of Defendants.

_____

## I. INTRODUCTION

On August 28, 2013, the undersigned United States District Judge heard oral argument

on Defendants Detective Brian Wentworth, Sergeant Bill Schmidt, Officer Roxanne Affeldt, and

Officer Robert Topp's Motion for Summary Judgment [Docket No. 9]. Plaintiffs Ronald R.

Rosen and June I. Trnka oppose the motion. For the reasons stated below, Defendants' motion is

granted in part and denied in part.

## II. BACKGROUND

On January 8, 2010, at approximately 12:55 a.m., police officers responded to an alarm

triggered at the Elm Creek Animal Hospital in Champlin, Minnesota. Irlbeck Aff. [Docket No.

16] Ex. 6, at 15. The officers responding to the alarm found the hospital's front window broken.

Id. at 16.  It had been snowing off and on for the past day, and the officers observed fresh footprints in the snow departing from the window area.  Id.  Defendants Sergeant Schmidt and Officer Affeldt arrived at the hospital as backup, and the officers established a perimeter while waiting for the police canine unit to arrive from Plymouth, Minnesota.  Id.

After the canine unit—consisting of Officer Topp and a trained police dog—arrived, the officers entered and cleared the hospital.  Irlbeck Aff. Ex. 5 ("Topp Dep.") at 14-16.  No intruder was inside, but the officers found an open cabinet which it appeared someone had rummaged through looking for medicine or other medical supplies.  Id. Ex. 4 ("Affeldt Dep.") 9.  Topp returned to the broken window and ordered the dog to "track."  Id. Ex. 5 ("Topp Dep.") 16-18. The dog followed the footprints south, away from the hospital and into a nearby parking lot.  Id. at 19.  At that point, perhaps due to recent snow-plowing, the footprints stopped.  Id. at 19-20. The dog continued tracking beyond the footprints, but lost the scent shortly thereafter.  Id. at 20.

Topp, accompanied by Affeldt, then guided the dog through a search of the strip mall and area surrounding the hospital.  Id. at 21.  Topp made a series of sweeping loops around the area, attempting to aid the dog in finding a scent to track, but to no avail.  He then guided the dog south, crossing a freshly-plowed road and proceeding along Downs Road, on which Plaintiffs' home is located.  See id. at 21-22.  Moving from side to side down the road of the residential area, the dog still had no clear scent to track.  Id. at 23.  However, as they approached Plaintiffs' property at the southern end of the road, the dog found a scent and led the officers toward Plaintiffs' house.  Id.

Plaintiffs' property is wooded and lined with shrubbery.  The house, where Plaintiffs live with their children, has an east-facing front entrance with a sidewalk that leads to the road.  Id. at

24-25.  The rear side of the house, west-facing and away from the road, has an enclosed porch with an exterior screen door.  Id. Ex. 2 ("Rosen Dep.") at 16; Ex. 20.  Although the porch is on the west side of the house, the exterior porch door faces south, parallel to the south side of the house.  See Irlbeck Aff. Ex. 15.  The exterior door does not have a lock.  Inside the porch is a second, secured door that leads into the house.  Plaintiffs use this door as their "private entrance."  Rosen Dep. 17-18.  During the winter of 2010, Plaintiffs kept the porch unheated and used it for storage.  Among other things, they kept winter jackets, shoes, and a refrigerator there.  See id. at 21; Irlbeck Aff. Ex. 20.

As Topp and Affeldt approached, they observed some footprints coming from the front of the house.  Topp. Dep. 24.  Officer Affeldt vaguely recalls snow piled near the front door.  Affeldt Dep. 27.  The dog led them up the sidewalk and to the front entrance, and then proceeded along the side of the house to the back porch, following a shoveled path.  Id. at 27; Topp Dep. 25.  The dog expressed interest in the porch area, and Topp recalls observing the interior door as being "slightly ajar."  Topp Dep. 27.  At that point, the officers deemed the tracking concluded, and the officers contacted Schmidt, who was investigating a church parking lot across the road.  Affeldt Dep. 18-19.

Schmidt joined Affeldt and Topp at the back porch, where the officers observed footprints near the exterior porch door.  A ceiling light in the porch was on, and looking through porch windows, the officers observed a pair of showy shoes inside.  Id. at 18, 26-27.  They would later learn the shoes belonged to Rosen.  Topp told the other officers that Plaintiffs' house might be "worth a knock."  Topp Dep. at 27-28.  Topp was concluding his role as the canine handler in the investigation, but was present while Affeldt and Schmidt began investigating.  See

id.

Affeldt and Schmidt concluded that the porch at the back of the house was the primary entrance. As a result, they opened the exterior door and entered the porch. Affeldt Dep. 20-21, 26-27. The officers then announced their presence and knocked on the interior porch door several times. Id. at 22. There was no response. Id. Schmidt next examined Rosen's shoes, a pair of "Skechers" sneakers, and thought that the tread marks in the soles of the shoes looked similar to the footprints left outside Elm Creek Animal Hospital. The presence of snow on the shoes also seemed suspicious to the officers, though Affeldt later admitted that because the porch was unheated and the outside temperature was well below freezing, the snow could have remained on the shoes from earlier in the day. Id. at 24. Regardless, Schmidt took the shoes and the two officers returned to the animal hospital. Id. at 23-25.

Discussing the case near the hospital, the officers concluded that they lacked any evidence to obtain a warrant to enter and search Plaintiffs' house. Irlbeck Aff. Ex. 8 ("Schmidt Audio") at 2:27:10. Although the recording of the conversation is somewhat unclear, the officers appeared to be comparing Rosen's shoes to the footprints at the scene of the break-in. At one point, Schmidt stated, "Those are cowboy boots. That's not the shoes I got." Id. at 2:31:05.

Several hours later, on the morning of January 8, 2010, Rosen prepared to leave his house and go to work, and discovered his shoes were missing. Rosen Dep. 15. At the time, he assumed one of his children had hidden the shoes as a prank, though he also noticed various footprints and dog tracks around the backyard of the house. Id. at 15, 21.

On that same morning, Sergeant Schmidt and Officer Affeldt wrote their police reports

about the burglary.  Regarding the officers' arrival at Plaintiffs' home, Schmidt wrote: "the K-9 continued a track outside, with officer Affeldt.  They continued from the Elm Creek Animal Hospital . . . then directly south on Downs road to [Plaintiffs' address].  The K-9 tracked directly to a rear porch area."  Irlbeck Aff. Ex. 10, at 3.  Schmidt wrote, "We attempted to make contact at the front door, still covering the rear; knocking on the door numerous times with no contact. We then attempted on the rear door, to make contact going through the small porch area, again with no contact."  Id.  This statement contradicts Officer Affeldt's report, who wrote that the officers first knocked on the rear door before knocking at the front entrance.  Id. Ex. 6, at 16. Officer Affeldt later testified she could not remember whether the officers attempted knocking on the front door at all.  Affeldt Dep. 19-20.  Both Officers Schmidt and Affeldt wrote that Rosen's shoes appeared to match the footprints found outside of the animal hospital.  Irlbeck Aff. Ex. 6, at 16; Ex. 10, at 2.

Twelve days later, Defendant Detective Wentworth investigated the burglary.  Irlbeck Aff. Ex. 3 ("Wentworth Dep.") 13.[1]  Wentworth reviewed the reports submitted by the officers, and visited the animal hospital and spoke with its employees.  Id. at 14.  Based on this information, Wentworth prepared a search warrant application in which he wrote the officers had followed footprints in the snow from the hospital directly to Plaintiffs' residence.  Id. Ex. 6, at 7. In addition to this visual tracking, he stated the police dog "tracked from the broken window" at the animal hospital directly to the residence.  Id.  Upon reaching the residence, "Officers found a pair of shoes on the porch covered with snow and the shoe print matched the prints in the snow

---

[1]  After the events in question, Wentworth returned to police officer status.  See Wentworth Dep. 5.  Because he was a detective at the relevant time, however, he will be referred to by this title.

that were next to the broken window of the business." Id.  Detective Wentworth had not

inspected any evidence nor viewed any police photographs at the time of writing the search

warrant application.  Wentworth Dep. 19-20.

On January 22, 2010, the Hennepin County District Court issued a search warrant

authorizing the search of Plaintiffs' residence for items stolen from the animal hospital.  Irlbeck

Aff. Ex. 6, at 9.  Later that day, Detective Wentworth and several officers executed the warrant.

Wentworth detained Rosen for about 90 minutes while the officers searched his home.

Wentworth Dep. 22-25; Rosen Dep. 37.  Wentworth repeatedly pressed Rosen to confess to the

burglary, telling Rosen that both footprints and the police dog's tracking had led the police

directly from the hospital to Rosen's shoes.  See Irlbeck Aff. Ex. 9 ("Wentworth Audio").  Rosen

steadfastly denied any involvement, and repeatedly volunteered for fingerprint and DNA

collection, as well as a polygraph test.  After over an hour of interrogation, Wentworth then

began implicating Rosen's children and Plaintiff Trnka in the theft, stating, "Someone's being

booked in for burglary today.  It's you, or one of these other people here.  Pick one."  Id. at 1:03.

Meanwhile, the search yielded no tie to the burglary.  The officers located a camera in the

house that resembled a camera stolen from the hospital, but they quickly confirmed the camera

did not belong to the hospital.  Irlbeck Aff. Ex. 6, at 3.  They found no other items of interest,

though they did cause some minor damage to a piece of Plaintiffs' furniture.  See Rosen Dep. 36-

37.  The officers then departed, with Wentworth stating he would return to arrest either Rosen or

a member of Rosen's family.  Rosen Dep. 41.

Several weeks later, after he had the opportunity to fully review the investigation record,

Wentworth wrote, "It is obvious that [Rosen's] shoes do not match the footprints in the snow at

the crime scene." Id. Ex. 6, at 5. At that time, Wentworth suspended the investigation. Id. He

also apologized to Rosen and returned his shoes. Rosen Dep. 42; Wentworth Dep. 31-32.

On April 30, 2012, Plaintiffs initiated this action in Hennepin County District Court by

serving Defendants with the Complaint. Plaintiffs allege four claims. First, Plaintiffs allege

Defendants violated 42 U.S.C. § 1983 by entering Plaintiffs' home and taking property without a

warrant, by falsifying information in a search warrant affidavit, and by illegally detaining Rosen

and searching Plaintiffs' home in violation of the Fourth and Fourteenth Amendments. Second,

Plaintiffs allege Defendants falsely imprisoned Rosen by virtue of his detainment during the

officers' search of Plaintiffs' home. Third, Plaintiffs allege Defendants trespassed on their

property by illegally entering their home both on the night of the burglary and in the execution of

the search warrant. Finally, Plaintiffs allege Defendants converted Plaintiffs' property when

they removed his shoes from Plaintiffs' porch. Not. of Removal [Docket No. 1] Ex. 1

("Complaint") ¶¶ 21-28. On May 16, 2012, Defendants removed this action to federal court

under 28 U.S.C. § 1331.

### III. DISCUSSION

**A. Summary Judgment Standard**

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law. The United States Supreme Court, in construing Federal

Rule 56(c), stated in Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986):

> In our view, the plain language of Rule 56(c) mandates the entry of
> summary judgment, after adequate time for discovery and upon
> motion, against a party who fails to make a showing sufficient to
> establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial.

On a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.  Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1134 (8th Cir. 1999).  However, the nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## B.  Section 1983

Public officials, including police officers, who "exercise some discretionary functions while carrying out their executive duties" are generally entitled to qualified immunity from § 1983 claims.  Walden v. Carmack, 156 F.3d 861, 869 (8th Cir. 1998).  Qualified immunity applies unless the official's conduct "violated clearly established statutory or constitutional rights of which a reasonable person would have known."  Id.  The court considers: "(1) whether the facts alleged or shown, construed most favorably to the plaintiffs, establish a violation of a constitutional right, and (2) whether that constitutional right was clearly established at the time of the alleged misconduct, such that a reasonable official would have known that the acts were unlawful."  Small v. McCrystal, 708 F.3d 997, 1003 (8th Cir. 2013).  Qualified immunity is "a question of law for the court, rather than the jury, to decide."  Littrell v. Franklin, 388 F.3d 578, 584-85 (8th Cir. 2004).

### 1.  Entry into porch

For their first theory of a § 1983 violation, Plaintiffs allege Sergeant Schmidt and

Officers Affeldt and Topp conducted an illegal, warrantless search of their backyard and porch.[2]

To determine whether Plaintiffs have introduced facts sufficient to support such a claim, several

key questions must first be resolved.

The parties disagree about what level of Fourth Amendment protection, if any, applies to

Plaintiffs' back porch. There are three possibilities. The porch is either: (1) part of the home,

(2) part of the home's curtilage, or (3) neither. If the porch is part of the home, the officers

conducted a warrantless search and the standard Fourth Amendment analysis will apply, because

the officers entered without consent and conducted a search of the items there. If the porch is

part of the curtilage, Fourth Amendment protections also apply, with an exception. See, e.g.,

United States v. Boyster, 436 F.3d 986, 991 (8th Cir. 2006). Officers may enter the curtilage of

a home for limited, legitimate law enforcement purposes, including to announce their presence

and make inquiries. This is sometimes referred to as a "knock and talk." United States v. Wells,

648 F.3d 671, 679 (8th Cir. 2011) (citation omitted); see also United States v. Raines, 243 F.3d

419, 420-21 (8th Cir. 2001). Typically, an officer must first attempt to reach the resident

through the front entrance before attempting another route. See, e.g., Raines, 243 F.3d at 420-

21. Finally, if the porch is neither house nor curtilage, no Fourth Amendment protection applies.

See, e.g., United States v. Dunn, 480 U.S. 294, 300 (1987) (observing Fourth Amendment

protections do not apply to "open fields").

In their opposition memoranda, Plaintiffs argue their porch is part of the curtilage, and

that the "knock and talk" exception does not apply because the officers approached the rear of

---

[2] In their briefing and at oral argument, Plaintiffs stated that they are not pursuing § 1983 liability against either of the municipal entities under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978). See Pls.' Mem. Opp'n Summ. J. [Docket No. 15] ("Pls.' Opp'n") at 31.

the house, and did so without a legitimate purpose. In a letter brief, Plaintiffs revise their position, and argue the porch is actually part of the house [Docket No. 22]. On the other hand, Defendants refuse to concede that Plaintiffs' back porch is part of the curtilage, let alone part of Plaintiffs' home. Defendants maintain the rear porch has the hallmarks of being a primary entrance, without any reasonable expectation of privacy. Among other things, Defendants argue that there was a path leading to the rear porch, there was a light on inside, and at least some portions of the porch were visible through the windows. In addition, the front door may have had some snow piled near or in front of it.

Defendants' argument is unpersuasive. The porch is, at the very least, a part of Plaintiffs' curtilage. Whether a particular area qualifies as curtilage varies depending on the facts of the case, but four factors aid in the determination: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." Dunn, 480 U.S. at 301. These factors strongly suggest Plaintiffs' porch was part of the curtilage. The porch is physically attached to the home, enclosed by a door, walls, and windows with blinds, and the yard itself is surrounded by trees and a privacy fence. Irlbeck Aff. Exs. 15, 16. Plaintiffs also used the porch as a "private entrance," stored personal belongings there, and received all public visitors, such as package deliverers, at the front door of the house. Rosen Dep. 18; see United States v. Wilson, No. 08-CR-2020-LRR, 2009 WL 905709, at *5-9 (N.D. Iowa Mar. 30, 2009) (holding storage of personal belongings in porch showed expectation of privacy). And, while there may have been a path leading to the porch, it was not paved and there is a dispute as to whether it was shoveled.

Pls.' Opp'n at 22; Defs.' Mem. Supp. Summ. J. [Docket No. 11] ("Defs.' Supp.") 3. These facts lead to the conclusion that Plaintiffs expected privacy in their porch and they treated it as a part of their home. See Dunn, 480 U.S. at 300 (holding the central inquiry regarding the curtilage is "whether the area harbors the intimate activity associated with the sanctity of a [person's] home and the privacies of life") (internal quotations omitted).

Whether Plaintiffs' porch should be considered to be a part of their home is a closer question, but the Court need not resolve it because even if the porch is part of the curtilage, Schmidt, Affeldt, and Topp's conduct does not fall within the "knock and talk" rule. The "knock and talk" rule allows officers to enter a person's curtilage because areas of public access—such as the steps leading to a front door—grant an implied consent to enter for the "normal interactions of a social, civilized society." Wells, 648 F.3d at 679 (citing United States v. Simms, 626 F.3d 966, 969-71 (7th Cir. 2010)). This implicit license "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave." Florida v. Jardines, 133 S. Ct. 1409, 1415 (2013).

Defendants argue that if the back porch is part of the curtilage, then Defendants properly entered under the "knock and talk" rule for the purpose of making contact with Plaintiffs. Defendants further argue that the "knock and talk" requirement obligating officers to first attempt contact through the front entrance "does not apply when officers do not knock at the front door first." Defs.' Supp. at 12 (citing Wells, 648 F.3d at 679-80). In other words, the officers argue they were under no obligation to try knocking on the front door before approaching the rear of the house because the officers bypassed the front of the house altogether.

Defendants misread <u>Wells</u> when they conclude that officers need not try the front area of public access first before considering alternate means of contact. In <u>Wells</u>, police officers acting on a tip regarding drug manufacturing approached a shed in the defendant's backyard without ever attempting to contact the defendant through his house's front door. The Eighth Circuit Court of Appeals affirmed suppressing the evidence the officers subsequently found, holding:

> Here, the officers made no attempt to raise Wells at the front door, nor did they pause at the door in the carport. Instead, they first walked to the back corner of the home from where they had a view of the entire backyard. Furthermore, this was no "pleasant summer evening"—it was 4:00 a.m. Other than perhaps their suspicion of drug manufacturing, there was no reason for the officers to think that Wells would be found in the backyard at that time, nor was there any reason for them to think that Wells generally would receive "visitors" there. That the officers were standing on a "driveway," is not a sufficient answer. Unlike the paved driveway in Wells's front yard, which connects to his front door via a paved walkway, the unpaved driveway passing around the side of the home is not an area "generally made accessible to visitors." We are not prepared to extend the "knock-and-talk" rule to situations in which the police forgo the knock at the front door and, without any reason to believe the homeowner will be found there, proceed directly to the backyard.

<u>Wells</u>, 648 F.3d at 680 (citations omitted). Essentially all of the factors the appellate court considered in <u>Wells</u> also apply here. Schmidt, Affeldt, and Topp made no attempt to engage Plaintiffs at the front door, even though the police dog showed initial interest in the front of the house, a paved sidewalk led to the front door, and visible footprints led from the road to the front of the house. Nor was this during the day or during a "pleasant evening" when an officer might reasonably expect to find Plaintiffs in their backyard; it was after 1:00 a.m. on a bitterly cold night. <u>See</u> <u>Raines</u>, 243 F.3d at 421. Similarly, that the officers could view the porch from the driveway was no justification for bypassing the front door. There was no paved path leading to the rear porch, and it is unclear if there was even a path shoveled in the backyard snow.

Defendants' arguments that the rear porch appeared to be the house's primary entrance are unpersuasive. Because the "knock and talk" rule does not apply to Schmidt, Affeldt, and Topp, the officers conducted a warrantless search of the porch.

When they do not have the owner's consent, police officers may conduct a warrantless search without violating the Fourth Amendment if exigent circumstances exist and the officers have probable cause. See, e.g., United States v. Parris, 17 F.3d 227, 229 (8th Cir. 1994). In this case, Defendants make no attempt to argue exigent circumstances existed, and the record itself does not demonstrate any such circumstances. See id. (stating examples of exigent circumstances, including when "lives are threatened, a suspect's escape is probable, or evidence is about to be destroyed"). Thus, the officers' search of Plaintiffs' porch violated Plaintiffs' Fourth Amendment rights.

Although the officers violated Plaintiffs' constitutional rights, the officers may still be entitled to qualified immunity if the violated constitutional right was not clearly established at the time of the alleged misconduct. Small, 708 F.3d at 1003. Whether a right is clearly established depends on whether a reasonable official would have known the conduct at issue violated a constitutional right. Id. In this case, having construed the facts in the light most favorable to Plaintiffs, a reasonable official should have known that directly proceeding to Plaintiffs' backyard in the middle of the night, entering their back porch without announcement, and examining and removing contents found therein violated Plaintiffs' Fourth Amendment rights. See, e.g., California v. Ciraolo, 476 U.S. 207, 212-13 (1986) ("The protection afforded the curtilage is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most

heightened."); Oliver v. United States, 466 U.S. 170, 180 (1984) ("At common law, the curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life . . . and therefore has been considered part of home itself for Fourth Amendment purposes. Thus, courts have extended Fourth Amendment protection to the curtilage . . . .") (internal quotation omitted). Nothing prevented the officers from attempting to reach Plaintiffs through the front door, at least as a first measure. The Court cannot conclude qualified immunity applies to the conduct described herein.

### 2. Search warrant

For their second theory of a § 1983 violation, Plaintiffs claim Defendants violated the Fourth Amendment by obtaining a search warrant using false pretenses. A police officer who applies for a search warrant is "entitled to qualified immunity from a § 1983 Fourth Amendment damage claim if his conduct was objectively reasonable." Morris v. Lanpher, 563 F.3d 399, 402 (8th Cir. 2009). However, "'[a] warrant based upon an affidavit containing deliberate falsehood or reckless disregard for the truth violates the Fourth Amendment' and subjects the police officer to § 1983 liability." Id. (quoting Bagby v. Brondhaver, 98 F.3d 1096, 1098 (8th Cir. 1996)).

Defendants argue that as an initial matter, the search warrant allegations should be directed against Detective Wentworth only, as he was the officer who drafted and submitted the warrant application. Next, Defendants argue Wentworth did not knowingly state false information in the warrant application. Plaintiffs respond that the search warrant allegations are alleged against all four individual defendants, because Sergeant Schmidt and Officers Affeldt and Topp included known falsehoods in their police reports, which in turn led Wentworth to draft a warrant application reflecting false information. See Letter Br., August 29, 2013 [Docket

No. 26] (citing Lawrence v. City of St. Paul, 740 F. Supp. 2d 1026, 1038-39 (D. Minn. 2010)).

In the Complaint and in their memoranda, however, Plaintiffs primarily focus on whether

Wentworth knew or should have known that he submitted false information in the search warrant

application. See, e.g., Compl. ¶ 11.

The search warrant theory of Plaintiffs' § 1983 claim will not survive as to Schmidt,

Affeldt, or Topp. In Lawrence, the key case cited by the parties on this issue, the plaintiff

alleged the police conducted a sham investigation, including filing false police reports, and thus

deprived her of substantive due process rights. Lawrence, 740 F. Supp. 2d at 1038-39. The

court conceded that the filing of false police reports could potentially lead to the deprivation of a

constitutionally protected interest. Id. In Lawrence, however, the allegedly falsified police

reports did not actually lead to the plaintiff's arrest; instead, her arrest resulted from her own

conduct. See id. at 1038. Because the falsified police reports themselves did not lead to a loss of

life, liberty, or property, the court denied the plaintiff's claim. Id. 1038-39.

Unlike in Lawrence, the police reports in this case led to a search warrant, which in turn

led to a loss of liberty—Rosen's 90-minute detention during the warrant's execution. However,

while there is some evidence that Schmidt and Affeldt included false information in their police

reports, there is no evidence suggesting that it was knowingly or intentionally included. In his

report, Schmidt wrote that he was informed that the police dog had tracked a scent from the

animal hospital to the rear porch of Plaintiffs' home. Irlbeck Aff. Ex. 10, at 3. While the

tracking has now been shown to have been intermittent rather than direct, Schmidt was not

present for the tracking and reported what he understood from secondhand information. See id.

Similarly, Affeldt wrote that she followed the police canine unit from the hospital to Plaintiffs'

house, but Affeldt was not handling the dog, and she did not write that the track or footprints leading her there were continuous. Id. Ex. 6, at 16. In addition, both officers observed footprints near Plaintiffs' rear porch that they believed matched footprints near the scene of the crime. See id. Ex. 10, at 3. As a result, their statements do not rise to the level of knowingly or recklessly false.

Both officers also wrote in their reports that Rosen's shoes "appeared" to match the prints found near the crime scene. Id. Ex. 10, at 3; Ex. 6, at 16. Plaintiffs cite Schmidt's statement at the crime scene, "Those are cowboy boots. That's not the shoes I got," as evidence that Schmidt knew the footprints did not match. Schmidt Audio at 2:31:05. This statement, viewed in the light most favorable to Plaintiffs, still does not demonstrate the inclusion of a knowing or reckless falsehood in Schmidt's report. As a comment made in the middle of the night, during the course of an investigation, and without crime lab analysis, this observation cannot be said to be knowingly or intentionally false. At most, Schmidt reversed an initial determination. Schmidt's on-the-scene guess as to the nature of forensic evidence does not demonstrate a knowing or reckless lie in his subsequent, official police report.

More troubling is that both officers recorded that they tried to contact Plaintiffs by knocking on the front door, a fact Defendants no longer assert and for which there is no testimonial support, not even from Affeldt herself. See Defs.' Supp. 4; Affeldt Dep. 19-20, 26-27. The statements regarding the front door, however, had no bearing on the evidence discussed in the search warrant application, and thus did not lead to Rosen's brief detention during the warrant's execution. Plaintiffs have failed to demonstrate how Schmidt or Affeldt knowingly stated false information, and if they did, how this information led to Rosen's detention.

Plaintiffs have also failed to demonstrate how Topp stated false information in his police report. Based on the record before the Court, Topp's brief report did not state any falsehoods, nor do Plaintiffs indicate the presence of any materially false information. <u>See</u> Irlbeck Aff. Ex. 6, at 18. Thus, the allegations regarding the search warrant application process will not survive against Topp.

With regard to Detective Wentworth, the search warrant application he wrote contained three material factual errors. First, Wentworth wrote that the officers followed footprints from the animal hospital directly to Plaintiffs' home. <u>Id.</u> Ex. 6, at 7. In actuality, there were no continuous footprints. <u>See</u> Topp Dep. 19-20. Second, Wentworth wrote the police dog tracked a scent directly from the hospital to Plaintiffs' porch. Irlbeck Aff. Ex. 6, at 7. But, the police dog lost the crime scene scent, and only later showed interest in Plaintiffs' home as it was being led in a sweeping pattern. <u>Id.</u> at 18. Third, Wentworth wrote that Rosen's shoes matched the footprints at the crime scene. <u>Id.</u> at 7. The crime lab later confirmed Rosen's shoes did not actually match the footprints. <u>See id.</u> at 4.

Although hindsight reveals the errors in Wentworth's warrant application, no evidence of record indicates Wentworth made false statements knowingly or with reckless disregard for the truth. When Wentworth wrote the search warrant application, he relied on the reports written by the officers and on information he received from the animal hospital's employees. Wentworth Dep. 14. Thus, when the officers wrote that they moved from the hospital to Plaintiffs' home with the police dog while conducting a search, Wentworth—who had no detailed information regarding the search—concluded that the officers had followed a continuous track. This conclusion was objectively reasonable, in particular because the officers reported finding fresh

footprints near Plaintiffs' home that they believed matched those at the crime scene. See, e.g., Mahamoud v. Schrum, No. 01-1375, 2002 WL 31248023, at *3 (D. Minn. Oct. 4, 2002) (holding it is objectively reasonable for police officer to rely on official reports written by other police officers).

Similarly, Wentworth did not have the benefit of viewing any evidence or photographs from the crime scene. Wentworth Dep. 16, 19-20. As a result, Wentworth reasonably relied on the officers' reports stating Rosen's shoes appeared to match the footprints at the crime scene. Only later when the crime lab had finished its analysis, and when Wentworth reviewed the evidence himself, did he conclude the prints did not match. See id. at 20-21. Because the record, and Wentworth's testimony, shows Wentworth did not make any knowing or reckless false statements in his warrant application, he did not violate the Fourth or Fourteenth Amendments. Morris, 563 F.3d at 402.

In an attempt to avoid this conclusion, Plaintiffs cite a report ostensibly written by Wentworth on January 20, 2010, in which Wentworth wrote, "Footprints in the snow do not match the shoes that were[] taken from [Plaintiffs' house]. Outside video surveillance from the mall across the street does not show any suspects. This case is inactive pending any new information." Irlbeck Aff. Ex. 11. This cursory report is a clear outlier from the record, and no reasonable factfinder could conclude that it was anything other than the result of a botched transcription, misdating, or other similar error. Wentworth maintained a separate file with ongoing narratives in which he recorded that he did not see photographs of the crime scene footprints until early February 2010, making his determination in the January 20 report impossible. Stubson Aff. [Docket No. 19] Ex. 1; Irlbeck Aff. Ex. 6, at 4. Similarly, Wentworth

did not contact the owner of the mall for video surveillance footage until February 5, 2010, over two weeks after the supposed date of the report. Irlbeck Aff. Ex. 6, at 5. Finally, Wentworth repeatedly noted the investigation as ongoing until February 11, 2010, making it nonsensical for him to record the investigation as suspended on January 20—the day he started his investigation and two days before he drafted the search warrant application. See id. at 2-4. The format of the document is also inconsistent with the other submitted narratives. Taken as a whole, the record could not lead a rational factfinder to conclude a genuine issue for trial exists as to the January 20 report. See Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).

### 3. Detainment

Plaintiffs also allege Rosen's detainment was illegal because it was based on an illegal search warrant. As discussed above, the Court concludes the search warrant application did not include knowingly or recklessly false statements of fact, and thus was not issued in violation of Plaintiffs' constitutional rights. Rosen's subsequent detainment during the execution of the warrant did not deprive him of a constitutional interest. See Michigan v. Summers, 452 U.S. 692, 703 (1981).

## C. State Law Claims

In addition to their § 1983 claim, Plaintiffs allege three state law claims against Defendants, for false imprisonment, trespassing, and conversion. Under Minnesota law, "the official immunity doctrine provides that a public official charged by law with duties which call for the exercise of his judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." Hassan v. City of Minneapolis, Minn., 489 F.3d 914, 920 (8th Cir. 2007) (quoting Elwood v. Cnty. of Rice, 423 N.W.2d 671,

677 (Minn. 1988)). Unlike the objective inquiry conducted for qualified immunity, official immunity involves examining whether the official acted with the subjective intent to do something he or she believed to be prohibited. <u>Wertish v. Krueger</u>, 433 F.3d 1062, 1067 (8th Cir. 2006). Thus, mistakes or the inadequacy of an investigation do not, by themselves, rise to the level of malice. <u>Johnson v. Cnty. of Dakota</u>, 510 N.W.2d 237, 241 (Minn. Ct. App. 1995). Official immunity also protects governmental entities from vicarious liability, if the official's actions are themselves subject to immunity. <u>Hassan</u>, 489 F.3d at 920.

Although Plaintiffs have established sufficient evidence to overcome Defendants' assertion of qualified immunity with respect to one § 1983 theory of liability, Plaintiffs have not established willful or malicious intent sufficient to overcome official immunity. Officers Wentworth, Topp, and Affeldt each testified as to their conduct, and none indicated anything other than an intent to properly investigate a burglary. The evidence may suggest less than stellar police work, but it does not demonstrate police officers acting with the intent to violate the law or Plaintiffs' property rights.

# IV.  CONCLUSION

Based on the foregoing, and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [Docket No. 9] is **GRANTED** in part and **DENIED** in part, as follows:

1.      Claims 2, 3, and 4 of the Complaint [Docket No. 1-1] are **DISMISSED**.

2.      Defendant Detective Brian Wentworth is **DISMISSED**.

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 9, 2013.